

FILED
2021 Dec-13  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **JAMES LIEBBE, RYAN MING, HUNTER QUINLAN, NICHOLAS HOGAN, BLAKE JOHNSON, RUSSELL OWEN,** and **TIM TODD,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | Case No._____ |
| **SAFER FEDERAL WORKFORCE TASK FORCE; KIRAN AHUJA,** in her official capacity as co-chair of the Safer Federal Workforce Task Force and the director of the Office of Personnel Management; **ROBIN CARNAHAN**, in her official capacity as co-chair of the Safer Federal Workforce Task Force and Administrator of the General Services Administration; and **JEFFREY ZIENTS,** in his official capacity as a co-chair of the Safer Federal Workforce Task Force and COVID-19 Response Coordinator; **THE BOEING COMPANY**, and **RAYTHEON TECHNOLOGIES**, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Come now the Plaintiffs, through their undersigned counsel, and respectfully

submit the following in support of the claims they assert herein against the named

1

Defendants:

## INTRODUCTION

1. All Plaintiffs herein are citizens of the sovereign State of Alabama, which has in its Constitution of 1901 the following provisions related to the purpose of Government:

> That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression. Alabama Constitution, Art. 1, §35.

> That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate. Art. 1, §36.

2. One important constitutional right recognized by the State of Alabama and which it is thus duty bound to protect is the Plaintiffs' right "to bodily integrity". *Crawford v. State*, 92 So. 3d 168, 174 (Ala. Crim. App. 2011). "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value – often under false pretenses and with deceptive practices hiding the nature of the interference – is a classic example of invading the core of the bodily integrity protection." *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019). Not only is the constitutional right to bodily integrity a right recognized by the State of Alabama, it is also a right recognized by the Government of the United States of

America. "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

3. In December, 2019, it is alleged that a virus originating from Wuhan, Hubei Province in the People's Republic of China, was infecting people and causing sickness around the world, including here in the United States. In response, President Trump curtailed travel into this country by parties outside the United States and commenced federal efforts to address what was then asserted to be a global pandemic. Here in Alabama, Governor Kay Ivey utilized authorities allegedly granted to her by Alabama law to impose a "lockdown" for almost a month. After eventually "permitting" private businesses to re-open, she imposed a mask mandate, that eventually was eliminated.

4. But almost a year ago, the United States Food and Drug Administration ("FDA") authorized three "vaccines"[1] for Emergency Use Authorization ("EUA"): the Pfizer-BioNTech COVID-19 Vaccine, the Moderna COVID-19 Vaccine, and the Janssen COVID-19 Vaccine, which have been administered ever since. Then with the start of the Biden Administration, the Safer Federal Workforce Task Force ("SFWTF") was created by the President, and its first duties were to encourage the

---

[1] The American public believes that these "liquids" are vaccines as commonly understood, when in reality they are "gene therapies."

use of face-masks and "social distancing" to help curtail the spread of COVID-19. Thereafter, the President and his Administration strongly encouraged Americans to take the three approved vaccines, while at the same time disclaiming any intent that the federal government would impose any vaccine mandates.[2]  But, by September of this year, the President exclaimed that his patience with the American people had ended and he was going to impose vaccine mandates by using the full extent of his executive power to accomplish such.

5. On September 9, President Biden issued Executive Order 14042 ("EO 14042") to mandate that federal contractors and their employees, for the purpose of "provid[ing] adequate COVID–19 safeguards for their workforce," should thereafter be subject to the dictats of the SFWTF.EO 14042 mandated that federal contractors must "comply with all guidance for contractor or subcontractor workplace locations published by the" SFWTF, and this was to be accomplished by modifying the contracts of federal contractors to mandate compliance with SFWTF "Guidance." That Guidance has mandated that the employees of federal contractors be vaccinated or secure an exemption therefrom.

6. Two large federal contractors in Huntsville are The Boeing Company

---

[2] See:
https://odysee.com/@WHATNOW:8/NO-FEDERAL-VACCINE-MANDATE:5
(All Internet links referenced in this complaint were visited on December 12, 2021).

("Boeing") and Raytheon Technologies ("Raytheon"). Boeing asserts on its website that it "is the world's largest aerospace company and leading manufacturer of commercial jetliners, defense, space and security systems * * *. As America's biggest manufacturing exporter, the company supports airlines and U.S. and allied government customers in more than 150 countries. Boeing products and tailored services include commercial and military aircraft, satellites, weapons, electronic and defense systems, launch systems, advanced information and communication systems, and performance-based logistics and training." While Raytheon does not claim to be as big as Boeing, it does proclaim a specialized expertise that other military defense contractors in the Rocket City lack: "Decades of work in missile defense have prepared the company well; now, when engineers set out to improve a system or design a new one, they have about 40 years of flight test data to work from. Raytheon Technologies' use of validated modeling and simulation – essentially, using computers to predict an interceptor's performance – has set the company apart."

7. The Plaintiffs in this case are employees of Boeing and Raytheon. Self evidently and on information and belief, it is asserted herein that these companies are federal contractors and the contracts they both have with the United States government have been amended pursuant to the SFWTF Guidance which requires that employees of these companies get vaccinated. Each Plaintiff herein objects to being vaccinated, and none have been vaccinated notwithstanding the federal

5

mandates to do so. Consequently, they file this lawsuit wherein they challenge EO 14042 as well as the forgoing "Guidance" as being void, without force and effect, and unconstitutional.

## JURISDICTION AND VENUE

8. This Court has federal subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, 1346, and 1361, as well as 5 U.S.C. §§ 702–703. The company Defendants are corporations organized in States other than Alabama and maintain their principle places of business in other States, but they conduct business in this District.

9. This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–02, the Constitution, and the Court's equitable powers.

10. Venue is proper within this District pursuant to 28 U.S.C. § 1391(e), because (1) the Plaintiffs reside in Alabama and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District. Some Defendants are United States agencies or officers sued in their official capacities.

## THE PLAINTIFFS

11. James Liebbe is a citizen and resident of Madison County, Alabama, and he has been employed at Boeing for 23 years.  In 2004, he was awarded the title of Associate Technical fellow for his expertise in integration of Command, Control,

Communications and Computer (C4) Intelligence Collection and Intelligence (C4ISR) government systems. James served in the U.S. Army and ArmyReserves starting in 1985 with an honorable discharge in 2005. He is currently the Technical Lead Engineer for Avionics Systems on the Core Stage segment of the ARTEMIS Space Launch System, scheduled to launch early next year.

12. Ryan Ming is a citizen and resident of Lawrence County, Alabama. He has a degree in Information Technology from Colorado State University. Presently Ryan is the Senior Linux Administrator for Raytheon Technologies under the Raytheon Missile System directive, located at Raytheon's Jan Davis Drive campus in Huntsville, Alabama. He has been employed by Raytheon for seven years and is a disabled Army Veteran of six years.

13. Hunter Quinlan is a citizen and resident of Madison County, Alabama. He has a bachelor degree in Computer Science and a bachelor degree in Cybersecurity from Thomas College. Presently, he is a System Engineer II for Raytheon Technologies, located at the Jan Davis Drive Campus in Huntsville, Alabama. Hunter has been employed by Raytheon for 3 months. In the past, he worked for the State of Maine in cybersecurity and has 2 year's experience as a former police officer.

14. Nicholas Hagan is a citizen and resident of Madison County, Alabama. He has two bachelor degrees from Thomas College, one in Computer Science, and the other in Cybersecurity; he also has a master's degree in Cybersecurity from

Northeastern University. Presently, Nicholas is a System Engineer II for Raytheon Technologies located at the Jan Davis Drive Campus in Huntsville, Alabama. He has been employed at Raytheon since May 2017.

15. Russell Owens is a U.S. citizen and is employed by Raytheon Missiles & Defense, located at 401 Jan Davis Drive in Huntsville, Alabama.  Russell is a graduate of Western New Mexico University, with a Bachelor of Science degree in Accounting and Business Management.  Russell has been employed by Raytheon for 28 years and presently holds the position of Director within the Global Supply Chain function.

16. Blake Johnson has been employed by Boeing for 8 months. He graduated with a masters degree in Mechanical and Aerospace Engineering from the Illinois Institute of Technology in 2017. Blake has been working professionally for 5 years as a project systems software engineer.

17. Timothy Todd is a graduate of Western New Mexico university with a BS in Business Administration. Presently he is employed as manager in Business Systems and Transformation for Raytheon Missiles and Defense in Huntsville, Alabama. He has been employed as a federal contractor for nearly 28 years.

**THE DEFENDANTS**

18. Defendant Safer Federal Workforce Task Force ("SFWTF"), a federal agency, was established on January 20, 2021 by President Biden via Executive Order

13991 (86 Fed.Reg. 7045, Jan. 25, 2121).

19. Defendant Kiran Ahuja is co-chair of the SFWTF.

20. Defendant Robin Carnahan is the co-chair of the SFWTF and Administrator of the General Services Administration.

21. Defendant Jeffrey Zients is co-chair of the SFWTF and is the Biden Administration's COVID-19 Response Coordinator.

22. Defendant The Boeing Company maintains its corporate headquarters at 100 North Riverside Drive in Chicago, Illinois, and has a large office in Huntsville, Alabama.

23. Defendant Raytheon Technologies maintains its corporate headquarters at 870 Winter Street in Waltham, Massachusetts, and has a large office in Huntsville, Alabama.

## STATUTORY AND FACTUAL BACKGROUND

24. As a result of the 2001 terrorist attacks, Congress determined that there was a need for a federal program to respond to any foreign attack using chemical, biological, radiological, or nuclear agents, and it thus enacted the "Project BioShield Act of 2004", Pub L. 108–276, 118 Stat. 835. Provisions of this act amended the Federal Food, Drug and Cosmetic Act by substantially re-writing 21 U.S.C. § 360bbb–3 into its present form (118 Stat. at 853). Pursuant to this section, when the Health and Human Service's Secretary determines that there is a "public health

emergency, * * * that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad," he may implement the powers authorized by this section, which include permitting EUAs for approved vaccines to treat individuals affected by the health crisis.

25. The following year via the "Public Readiness and Emergency Preparedness Act", Pub L. 109–148, 119 Stat. 2818, Congress amended provisions of the Public Health Service Act by adding a new section to it, now codified at 42 U.S.C. § 247d–6d. This section provides immunity from suit for "covered persons" during a "covered countermeasure," which is a response to a declared national health crisis.

26. On Friday, October 18, 2019, at The Pierre Hotel in New York City, Event 201 was conducted, which was a global pandemic exercise.[3] This careful planning happened just a little less than two months before events in Wuhan, China, garnered worldwide attention. On December 31, 2019, "WHO's Country Office in the People's Republic of China picked up a media statement by the Wuhan Municipal Health Commission from their website on cases of 'viral pneumonia' in Wuhan, People's Republic of China."[4] By January 25, 2020, the "WHO Regional Director for Europe issued a public statement outlining the importance of being ready at the local and

---

[3] See: https://www.centerforhealthsecurity.org/event201/about

[4] See WHO Timeline of COVID events: https://www.who.int/news/item/29-06-2020-covidtimeline

national levels for detecting cases, testing samples and clinical management."

27. In response, President Trump on January 31, 2020, issued his "Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Risk of Transmitting 2019 Novel Coronavirus,"[5] that interdicted international travel from China into the United States. As events developed, the perceived threat posed by COVID-19 appeared to be increasing, causing President Trump to thereafter issue his "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak" on March 13, 2020.[6]

28. "On February 4, 2020, the Secretary determined pursuant to his authority under section 564 of the FD&C Act that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad and that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City, Hubei Province, China in 2019 (2019-nCoV)." 85 Fed.Reg. 7316 (February 7, 2020). Thereafter, various vaccine manufacturers such as Pfizer, Inc., Johnson and Johnson, and Moderna commenced at "warp speed" research on vaccines to treat COVID-19, and these efforts were reaching fruition by early

---

[5] See Proclamation9984, 85 Fed.Reg. 6709 (Feb. 5, 2020).

[6] Proclamation 9994, 85 Fed.Reg. 15338 (March 18, 2020).

December, 2020.

29. On December 3, 2020 (85 Fed.Reg. 79190, Dec. 9, 2020), the HHS Secretary granted immunity for "covered countermeasures" to vaccine manufacturers ("covered persons") that he might thereafter authorize to produce and distribute a vaccine.

30. On December 11, 2020, the Pfizer-BioNTech COVID-19 Vaccine was granted EUA (86 Fed.Reg. 5200, Jan. 19, 2021). The Secretary found that

> "it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective. Additionally, it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 16 years of age and older" (86 Fed.Reg. at 5203).

31. But, the EUA for this vaccine imposed various reporting requirements on Pfizer, Inc., which included providing critical information about adverse reactions to the vaccine to the Vaccine Adverse Events Reporting System ("VAERS"):[7]

F. Pfizer Inc. will report to Vaccine Adverse Event Reporting System

---

[7] "Established in 1990, the Vaccine Adverse Event Reporting System (VAERS) is a national early warning system to detect possible safety problems in U.S.-licensed vaccines. VAERS is co-managed by the Centers for Disease Control and Prevention (CDC) and the U.S. Food and Drug Administration (FDA). VAERS accepts and analyzes reports of adverse events (possible side effects) after a person has received a vaccination. Anyone can report an adverse event to VAERS. Healthcare professionals are required to report certain adverse events and vaccine manufacturers are required to report all adverse events that come to their attention." See: https://vaers.hhs.gov/about.html

(VAERS):
• Vaccine administration errors whether or not associated with an adverse event;
• Serious adverse events (irrespective of attribution to vaccination);
• Cases of Multisystem Inflammatory Syndrome in children and adults; and
• Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.
These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.[8]

32. A few days after the grant of EUA for the Pfizer vaccine, ModernaTX, Inc., was granted an EUA for its vaccine, Moderna COVID-19 Vaccine, on December 18, 2020 (86 Fed.Reg. 5211, Jan. 19, 2021). The Secretary made the essential findings that this vaccine "was believed to be effective" and that the "potential benefits of Moderna COVID-19 Vaccine outweigh the known and potential risks" (86 Fed.Reg. at 5212). Further, a duty was also imposed on ModernaTX, Inc., to make reports to VAERS similar to that for Pfizer (86 Fed.Reg. at 5216).

33. On February 27, 2021, Janssen Biotech, Inc., was granted an EUA for its vaccine, Janssen COVID-19 Vaccine (86 Fed.Reg. 28608, May 27, 2021). Again, the FDA made the essential findings that this vaccine "was believed to be effective" and that the "potential benefits of Moderna COVID-19 Vaccine outweigh the known and potential risks" (86 Fed.Reg. at 28620). Finally, a duty was also imposed on Janssen Biotech, Inc., to make reports to VAERS similar to that for Pfizer (86 Fed.Reg. at

---

[8] 86 Fed.Reg. at 5207.

28624).

34. These "COVID-19 vaccines authorized or approved by the [FDA] effectively protect vaccinated individuals against severe illness and death from COVID-19" (86 Fed.Reg. 61402-03, Nov. 5, 2021).

## THE VACCINE MANUFACTURERS

35. In 1849, two German immigrants, Charles Pfizer and his cousin Charles F. Erhart, formed a company that eventually became Pfizer, Inc., which currently is an American multinational pharmaceutical and biotechnology corporation with headquarters in New York City. Its annual revenues exceed that of small countries like New Zealand.

36. When developing vaccines, Pfizer has engaged in harmful conduct which has resulted in lawsuits. In 1996 in Nigeria, its vaccine experiments resulted in the death and other severe injuries to a number of Nigerian children. As a result, Pfizer was sued and the Second Circuit described Pfizer's injurious conduct in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 169 (2d Cir. 2009):

> [I]n April 1996, Pfizer, dispatched three of its American physicians to work with four Nigerian doctors to experiment with Trovan on children who were patients in Nigeria's Infectious Disease Hospital ("IDH") in Kano, Nigeria. Working in concert with Nigerian government officials, the team allegedly recruited two hundred sick children who sought treatment at the IDH and gave half of the children Trovan and the other half Ceftriaxone, an FDA-approved antibiotic the safety and efficacy of which was well-established. Appellants contend that Pfizer knew that Trovan had never previously been tested on children in the form being used and that animal tests showed that Trovan had

life-threatening side effects, including joint disease, abnormal cartilage growth, liver damage, and a degenerative bone condition. Pfizer purportedly gave the children who were in the Ceftriaxone control group a deliberately low dose in order to misrepresent the effectiveness of Trovan in relation to Ceftriaxone. After approximately two weeks, Pfizer allegedly concluded the experiment and left without administering follow-up care. According to the appellants, the tests caused the deaths of eleven children, five of whom had taken Trovan and six of whom had taken the lowered dose of Ceftriaxone, and left many others blind, deaf, paralyzed, or brain-damaged.

This case was later settled.[9]

37. In 2002, Pharmacia & Upjohn Company, a Pfizer subsidiary, developed a drug named Bextra, and started vigorously promoting its sale to its sale force. The start of this sales program was described as follows in the sentencing memorandum of the AUSA who brought criminal charges against Pfizer:

Bextra was officially launched at a national meeting for sales representatives in Atlanta, Georgia from April 9-12, 2002. During this meeting, the sales force was given a vivid message of how to promote Bextra for the "power" position. They were inundated with displays of music, light shows, acrobats and dancers. The marketing managers led the entire audience in thrusting their fists into the air (the marketing symbol of Bextra) and pounding them against their upraised hands in unison to symbolize the power of Bextra and to "Power Up" the sales force. Ultimately, simulated large steel doors crash down on the stage, and the Bextra fist symbol crashed through the doors. The events from the launch demonstrates the sales frenzy that accompanied Bextra, as the company strove to make the drug reach "blockbuster" (billion dollar a year sales) status.

38. Condensing this sordid story, Pharmacia sales representatives promoted Bextra using false and misleading claims, eventually leading to civil actions being

_____

[9] See: https://www.law.com/almID/1202482854504/

filed by the United States as well as federal criminal charges in several districts.

These civil and criminal charges were ultimately settled by Pfizer, and the

Department of Justice press release summarized that conclusion:

> American pharmaceutical giant Pfizer Inc. and its subsidiary Pharmacia &
> Upjohn Company Inc. (hereinafter together "Pfizer") have agreed to pay $2.3
> billion, the largest health care fraud settlement in the history of the Department
> of Justice, to resolve criminal and civil liability arising from the illegal
> promotion of certain pharmaceutical products, the Justice Department
> announced today.

> Pharmacia & Upjohn Company has agreed to plead guilty to a felony violation
> of the Food, Drug and Cosmetic Act for misbranding Bextra with the intent to
> defraud or mislead. * * * The company will pay a criminal fine of $1.195
> billion, the largest criminal fine ever imposed in the United States for any
> matter. Pharmacia & Upjohn will also forfeit $105 million, for a total criminal
> resolution of $1.3 billion.[10]

39. It is reported that since 2000, Pfizer has paid $4,660,896,333 in penalties.[11]

40. Johnson & Johnson/Janssen Pharmaceuticals, Inc., have had similar

problems.  In April, 2010, the Department of Justice announced that two "Johnson &

Johnson Subsidiaries [agreed] to Pay Over $81 Million to Resolve Allegations of

Off-Label Promotion of Topamax Epilepsy Drug Approved by FDA Promoted for

---

[10] See:
https://www.justice.gov/opa/pr/justice-department-announces-largest-health-care-fraud-settlement-its-history .

[11] See:
https://violationtracker.goodjobsfirst.org/prog.php?parent=pfizer&sort=asc

Psychiatric Uses".[12] In 2012, 37 State Attorneys General reached a similar settlement regarding the promotion and sale of the drug, Risperdal: "Janssen Pharmaceuticals has agreed to pay $181 million to settle claims brought against it by Oregon Attorney General Ellen F. Rosenblum and 36 other Attorneys General alleging that the drug company used unfair and deceptive practices in marketing Risperdal and three related anti-psychotic drugs." [13] In November, 2013, the Department of Justice announced that "Johnson & Johnson [agreed] to Pay More Than $2.2 Billion to Resolve Criminal and Civil Investigations". [14] More recently to address its role in assisting the Opioid crisis that has recently plagued a number of States in this American Union, the New York Attorney General announced a $230,000,000 settlement with the company.[15]

41. Johnson & Johnson has paid a total of $9,248,447,763 in penalties since

---

[12] See: https://www.justice.gov/opa/pr/two-johnson-johnson-subsidiaries-pay-over-81-million-resolve-allegations-label-promotion

[13] See: https://www.doj.state.or.us/media-home/news-media-releases/oregon-attorney-general-and-36-others-reach-181-million-risperdal-settlement/

[14] See: https://www.justice.gov/opa/pr/johnson-johnson-pay-more-22-billion-resolve-criminal-and-civil-investigations

[15] See: https://ag.ny.gov/press-release/2021/attorney-general-james-reaches-230-million-settlement-treatment-and-prevention

2000.[16]

42. Moderna, Inc., was formed in 2010 and has since been primarily devoted to research and development of vaccines.[17] The first product it has EVER distributed to the American public is its experimental COVID-19 vaccine which is available only because of its EUA approval. This vaccine is now being sold to a number of countries around the world, which obviously makes its stockholders happy.

## ADOPTION OF EO 14042

43. On September 9, 2021, President Biden issued EO 14042 (86 Fed. Reg. 50985),[18] the purpose of which was to "decrease the spread of COVID–19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." To achieve this goal, this Order directed that "new contracts" and similar agreements of the federal government to obtain goods and services from various vendors and manufacturers were to include certain COVID provisions therein.

44. This Order directed the recently established SFWTF to draft and develop

---

[16] See: https://violationtracker.goodjobsfirst.org/prog.php?parent=johnson-and-johnson (last visited Nov. 16, 2021).

[17] See: https://en.wikipedia.org/wiki/Moderna

[18] See Exhibit 1 attached hereto.

a "Task Force Guidance" document by September 24, 2021 and submit the same to the Director of the Office of Management and Budget, and if that Director determines that such Guidance "will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors", that determination was to be published in the Federal Register.[19]

45. The "Task Force Guidance,"[20] as with all such federal agency Guidances, is without force and effect as law because the same has not been promulgated as a "rule" pursuant to the Administrative Procedure Act, 5 U.S.C. § 552, *et seq*., and 41 U.S.C. § 1707 (b).  *Jean v. Nelson*, 711 F.2d 1455, 1474-77 (11th Cir. 1983).

46. Further, the determination of the Director of the Office of Management and Budget is without force and effect as law because it has not been promulgated as a "rule" pursuant to the Administrative Procedure Act, 5 U.S.C. § 552, *et seq*. *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979); *Alamo Express, Inc. v. United States*, 613 F.2d 96 (5th Cir. 1980); *United States v. Harvey*, 659 F.2d 62, 64 (5th Cir. 1981); and *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001).

## COUNT 1: UNLAWFUL EXERCISE OF UNCONSTITUTIONAL LEGISLATIVE POWER
(applicable to all Defendants)

---

[19] That determination was so published in the Federal Register of September 28, 2021, 86 Fed.Reg. 53691.

[20] See Exhibit 2 attached hereto.

47. Plaintiffs incorporate each of the Complaint allegations stated above herein.

48. The police power of the States forms "a portion of that immense mass of legislation which embraces everything within the territory of a State not surrendered to the General Government; all which can be most advantageously exercised by the States themselves. Inspection laws, *quarantine laws, health laws of every description*, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts of this mass." *Gibbons v. Ogden*, 22 U.S. 1, 203 (1824) [emphasis added].

49. This police power encompasses the power of the States to regulate the practice of medicine, not the federal government or its officers, agents and employees. See *Linder v. United States*, 268 U.S. 5, 18 (1925) ("Obviously, direct control of medical practice in the states is beyond the power of the federal government"); *Lambert v. Yellowley*, 272 U.S. 581, 598 (1926)("It is important also to bear in mind that 'direct control of medical practice in the States is beyond the power of the Federal Government.' * * * Congress, therefore, cannot directly restrict the professional judgment of the physician or interfere with its free exercise in the treatment of disease. Whatever power exists in that respect belongs to the states exclusively."); *Du Vall v. Board of Medical Examiners*, 49 Ariz. 329, 335, 66 P.2d 1026 (1937)("the states have not delegated to the United States the power to * * * regulate the practice of medicine."); *Ghadiali v. Delaware State Medical Society*, 48

F.Supp. 789 (D.Del. 1943)(the practice of medicine is a State concern); *F.T.C. v. Simeon Management Corp.*, 391 F.Supp. 697 (N.D.Cal. 1975), affirmed at 532 F.2d 708 (9th Cir. 1976); *United States v. Evers*, 453 F.Supp. 1141, 1150 (M.D.Ala. 1978); *Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002); and *Oregon v. Ashcroft*, 368 F.3d 1118, 1124 (9th Cir. 2004).

50. In Alabama, the practice of medicine is defined via Ala. Code § 34-24-50 as encompassing the "diagnos[ing], treat[ing], correct[ing], advis[ing] or prescrib[ing] for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, by any means or instrumentality," which obviously includes vaccination.[21] Congress clearly lacks the constitutional authority to impose vaccine mandates within the jurisdiction of the States of this Union. See *Printz v. United States*, 521 U.S. 898, 919 (1997)("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'").

---

[21] The CDC defines relevant terms as follows:
Vaccine: A preparation that is used to stimulate the body's immune response against diseases. Vaccines are usually administered through needle injections, but some can be administered by mouth or sprayed into the nose.
Vaccination: The act of introducing a vaccine into the body to produce protection from a specific disease.
Immunization: A process by which a person becomes protected against a disease through vaccination. This term is often used interchangeably with vaccination or inoculation.
See: https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm

51. The President claimed 3 U.S.C. § 301 as one statutory authority to issue EO 14042. This section provides as follows:

> The President of the United States is authorized to designate and empower the head of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate, to perform without approval, ratification, or other action by the President (1) any function which is vested in the President by law, or (2) any function which such officer is required or authorized by law to perform only with or subject to the approval, ratification, or other action of the President: Provided, That nothing contained herein shall relieve the President of his responsibility in office for the acts of any such head or other official designated by him to perform such functions. Such designation and authorization shall be in writing, shall be published in the Federal Register, shall be subject to such terms, conditions, and limitations as the President may deem advisable, and shall be revocable at any time by the President in whole or in part.

52. This section only authorizes the President to delegate to other federal officers, agencies, agents and employees any statutory authority already delegated to him by a specific act of Congress. But, it does not constitute an independent basis for the President to impose vaccine mandates or to exercise legislative power. *United States v. Lee*, 106 U.S. 196 (1882). "The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *Panama Refining Company v. Ryan*, 293 U.S. 388, 421 (1935).

53. The President also claimed provisions of the Federal Property and Administrative Services Act, 40 U.S.C. § 101, *et seq.,* as statutory authority to issue EO 14042. This section provides as follows:

54. The purpose of this subtitle is to provide the Federal Government with an

economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

55. The subsequent provisions of the Federal Property and Administrative Services Act are no broader than the purpose of this Act as expressed in § 101.

56. Moreover, it is impossible to find an act of Congress delegating to the President the authority to mandate vaccines, or to delegate this non-existent authority to his subordinates. In 1926, Congress codified most of the federal laws and thus created Title 40 of the U.S. Code. The 1926 version of this title was only 22 pages long, and the President was mentioned only 23 times therein. The 1940 version of title 40, U.S. Code, was only 63 pages long and the President was mentioned therein only 59 times. In the 1952 version of 40 U.S.C.[22] (which was 127 pages long), the President was mentioned only 64 times. In title 40 of the 1964 U.S. Code (which was 151 pages long), the President was mentioned only 98 times. The 1996 version of this

---

[22] The "Federal Property and Administrative Services Act of 1949" was enacted by Congress on June 30, 1949, 63 Stat. 377, ch. 288. It was codified into 40 U.S.C. and has been subject to a number of amendment ever since.

title was 316 pages long, and the President was mentioned therein 192 times. The 2003 version of this title was 219 pages long, and the President was mentioned therein only 132 times. Finally, the latest version of this title published in the 2019 U.S. Code, is 263 pages and the President is mentioned therein 153 times.[23]

57. The prior versions of this title were only "evidence of the law," but on August 21, 2002, this title was enacted into positive law by Pub. L. 107–217, 116 Stat. 1062.

58. House Report 107-479 related to the enactment of this title stated that the "purpose of the bill [was] to revise, codify, and enact without substantive change the general and permanent laws of the United States related to public buildings, property, and works, as as [sic] title 40, United States Code, 'Public Buildings, Property, and Works'".

59. However, these laws codified in 40 U.S.C. do not provide the President with authority to impose vaccine mandates, and thus he lacks the statutory as well as constitutional authority to impose these mandates he may believe will assist in a speedy resolution of the current COVID-19 crisis. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).[24]

---

[23] On request, counsel for the plaintiffs will provide to the Defendants or the court searchable PDF images of these various versions of 40 U.S.C.

[24] See also *Schaezlein v. Cabaniss*, 135 Cal. 466, 471, 67 P. 755 (1902); *State v. Marana Plantations*, 75 Ariz. 111, 115, 252 P.2d 87 (1953); and *Boreali v.*

60. Early during this COVID-19 crisis, the Governor of Michigan imposed a wide variety of restrictions to address this pandemic, but the Michigan Supreme Court found that she was unlawfully exercising undelegated legislative power. See *Midwest Inst. of Health, PLLC v. Governor of Mich. (In re Certified Questions from the United States Dist. Court)*, 506 Mich. 332, 958 N.W.2d 1 (2020).

61. Also during this crisis, a federal agency claimed the authority to impose an eviction moratorium, but this unlawful exercise of legislative power by a federal agency was declared unconstitutional in several cases. See *Tiger Lily, LLC v. United States Dept. of Housing and Urban Development*, 992 F.3d 518 (6th Cir. 2021); *Ala. Ass'n of Realtors v. United States HHS*, No. 20-cv-3377 (DLF), 2021 U.S. Dist. LEXIS 85568 (D.D.C. May 5, 2021); and *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021).

62. Even more recently, other courts have recognized that federal officials have been unlawfully exercising undelegated legislative power. See *BST Holdings, LLC v. Occupational Safety and Health Admin.*, 17 F.4th 604, 616–18 (5th Cir. 2021); *Missouri v. Biden*, No. 4:21-cv-01329-MTS, 2021 U.S. Dist. LEXIS 227410 (E.D. Mo. Nov. 29, 2021); *Louisiana v. Becerra*, No. 3:21-CV-03970, 2021 U.S. Dist. LEXIS 229949 (W.D. La. Nov. 30, 2021); *Commonwealth of Kentucky v. Biden*, No. 3:21-cv-00055-GFVT, 2021 U.S. Dist. LEXIS 228316 (E.D. Ky. Nov. 30, 2021);and *Axelrod*, 71 N.Y.2d 1, 6, 517 N.E.2d 1350 (1987).

*Georgia v. Biden*, No. 1:21-cv-163, 2021 U.S. Dist. LEXIS 234032 (S.D. Ga. Dec. 7, 2021) (See Ex. 3 attached hereto). As Justice Gorsuch has recently observed regarding these types of restrictions, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese v. Cuomo*, 592 U. S. __, 141 S. Ct. 63 (2020).

63. For relief, Plaintiffs request that this court declare that EO 14042 is void, being the result of the unlawful exercise of legislative power by the President.

### COUNT 2: 21 U.S.C. § 360bbb–3 AND RIGHT TO REFUSE VACCINE
(applicable to all Defendants)

64. Plaintiffs incorporate each of the Complaint allegations stated above herein.

65. The Plaintiffs have a constitutional right to work. "Nothing is better settled in our constitutional law than that liberty does not mean merely freedom from physical restraint, but includes the right to work for a living by using the powers of brain and muscle in the ordinary activities of mankind." *Morehead v. N.Y. ex rel Tipaldo*, 298 U.S. 587, 601 (1936). As noted *infra*, they also possess the constitutional right to bodily integrity.

66. EO 14042 (Ex. 1 attached hereto) as well as the Guidance (Ex. 2 attached hereto) issued by the SFWTF constitute unconstitutional conditions.

67. Moreover, to the extent that the President contends that EO 14042 authorizes the imposition of mandatory vaccines, that construction is illegal and

contrary to the plain language of 21 U.S.C. § 360bbb–3 (e)(1)(A)(ii): recipients of an EUA vaccine must be informed "(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

68. Pursuant to the above quoted § 360bbb–3, every American, possesses the constitutional right to bodily integrity,[25] and has the perfect right to refuse an EUA vaccination for any disease, whether COVID-19 or some other disease.

69. For relief, Plaintiffs request that this court declare that § 360bbb–3 permits any American such as the Plaintiffs to refuse a vaccine (especially one that has been authorized via an EUA) without penalty (including termination of a job).

## COUNT 3 (APA CLAIM): FAILURE OF PUBLICATION OF "RULE"
(applicable to all Defendants)

70. Plaintiffs incorporate each of the Complaint allegations stated above herein.

71. The Guidance issued by the SFWTF is a "rule" for purposes of the Administrative Procedure Act and consequently has no force and effect.

72. For relief, Plaintiffs request that this court declare that the SFWTF

---

[25] See *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005) ("These special 'liberty' interests include 'the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion.'").

Guidance is void and without any lawful force and effect.

The Plaintiffs also request such other, further and different relief to which they may be entitled.

Respectfully submitted this the 13th day of December, 2021.


  /s/ *Lowell H. Becraft, Jr.*            /s/ *Brian A. Dasinger*
Lowell H. Becraft, Jr.                 Brian A. Dasinger, P.C.
Attorney for Plaintiffs                Attorney for Plaintiffs
ASB 5005-F66L                          ASB 3389-A63D
403C Andrew Jackson Way                22811 Hwy 98, Suite 3
Huntsville, AL 35801                   Fairhope, AL 36532
256-533-2535                           251-928-5588
becraft@hiwaay.net                     dasingerdefense.com